# UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF VIRGINIA
### NEWPORT NEWS DIVISION

| | |
|---|---|
| In re: ) | |
| ) | |
| LEROY MANGRUM, JR., ) | |
| DORIS R. MANGRUM, ) | |
| ) | Case No. 16-51687-FJS |
| *Debtors*. ) | |
| ) | |
| ) | |
| BRENDA L. CHAVIS, in her capacity as ) | |
| co-beneficiary of the ESTATE OF BOBBIE ) | |
| F. WYNDER, ) | |
| ) | |
| ) | APN 17-05007-FJS |
| *Plaintiff*, ) | |
| ) | |
| v. ) | |
| ) | |
| LEROY MANGRUM, JR., ) | |
| ) | Chapter 7 |
| *Defendant*. ) | |

## MEMORANDUM OPINION

On November 16, 2018, this matter came before the Court for trial on the Complaint to Determine Nondischargeability of Debt (the "Complaint") filed on February 13, 2017, by Brenda L. Chavis ("Chavis"), in her capacity as co-beneficiary of the probate estate of Bobbie F. Wynder (the "Estate"). The Complaint seeks a determination that an indebtedness owed by Leroy Mangrum, Jr. ("Mangrum") to the Estate is nondischargeable under 11 U.S.C. § 523(a)(4) because of Mangrum's alleged defalcation while serving as attorney-in-fact for Bobbie F. Wynder ("Wynder") pursuant to a general power of attorney. The debt at issue originates from a judgment initially entered by the Circuit Court for the City of Hampton, Virginia (the "Circuit Court"), holding in relevant part that Mangrum violated § 1612 of the Virginia Uniform Power of Attorney

Act (Va. Code. Ann. § 64.2-1600 *et seq.*) when he cashed in an annuity belonging to Wynder valued at $116,330.64 (the "Annuity") while serving as her attorney-in-fact, and that he must restore those funds to the Estate. *See* Pl.'s Ex. 1 at 262-63; *see also id.* at 284-85.

This adversary proceeding constitutes a core proceeding over which this Court has jurisdiction under 28 U.S.C. §§ 157(b)(2)(I) and 1334(b). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409(a).

Upon consideration of the evidence presented at trial and for the reasons set forth below, the Court finds and concludes that Mangrum's debt to the Estate did not arise from defalcation within the meaning of § 523(a)(4). The following constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52, as incorporated into the Federal Rules of Bankruptcy Procedure by Rule 7052.

**Procedural History**

Leroy and Doris Mangrum filed a joint voluntary petition for relief under chapter 7 of the Bankruptcy Code on December 17, 2016. Chavis timely initiated this adversary proceeding by filing the Complaint on February 13, 2017. Mangrum answered the Complaint on March 16, 2017 (the "Answer"), and generally denied all of its material allegations.[1] *See* Answer at 1, ECF No. 7.

At a pre-trial conference held on April 28, 2017, counsel for Chavis represented that the Circuit Court's judgment was on appeal to the Supreme Court of Virginia.[2] The Court thus continued the pre-trial conference generally pending the outcome of the appeal. *See* Order Cont. Generally at 2, ECF No. 9.

---

[1] The Answer to the Complaint also asserts, as a counterclaim, that the "[p]laintiff's position in this matter is not substantially justified" and requests an award of attorney's fees and costs under § 523[](d). Answer at 1.

[2] The parties previously obtained relief from the automatic stay in the main bankruptcy case to pursue the appeal. *See* Order Granting Mot. for Relief, Case No. 16-51687-FJS, ECF No. 51.

2

After receiving notice of the opinion and order entered on March 1, 2018, by the Supreme Court of Virginia, which affirmed the Circuit Court in part, the Court reconvened the pre-trial conference on April 20, 2018. Counsel for both parties advised the Court that the only issue remaining in this case was whether Mangrum possessed the requisite culpable state of mind to prove defalcation under § 523(a)(4). The Court thus limited the scope of the proceedings to the narrow issue of Mangrum's mental state and invited the parties to file simultaneous briefs on that issue. Instead, on May 31, 2018, Chavis filed a motion for summary judgment, and Mangrum filed a motion to dismiss.[3] At a hearing held on July 20, 2018, the Court denied both motions because there remained a genuine issue of material fact with respect to Mangrum's state of mind for purposes of § 523(a)(4).[4] *See* Order Denying Summ. J. Mot., ECF No. 31; Order Denying Mot. to Dismiss, Adv. Pro. No 30.

At trial, Mangrum was the only witness examined by either party. No objections were lodged to Mangrum's testimony. The Court also admitted without objection all exhibits offered by the parties into evidence. Following the trial, the parties filed supplemental briefs at the Court's invitation.

**Findings of Fact**

Mangrum testified at trial as to his decades-long relationship with Wynder and the events specifically related to the matter before the Court. During his testimony, Mangrum proved himself to be an excellent oral historian who was confident in his recollections of the past. Even though

---

[3] The motion to dismiss failed to cite any provision of Federal Rule of Civil Procedure 12 upon which relief was sought.

[4] "It is well-established that summary judgment is generally inappropriate where issues of knowledge, intent, state of mind, motive, sincerity, conscience and other subjective feelings are implicated." *Trs. of the Sheet Metal Workers' Nat'l Pension Fund v. Kakareko* (*In re Kakareko*), 575 B.R. 12, 28 (Bankr. E.D.N.Y. 2017) (citing *Krishna v. Colgate Palmolive Co.*, 7 F.3d 11, 16 (2d Cir. 1993)).

Mangrum's advanced years appeared to contribute to some difficulty in organizing his thoughts and speech, his testimony was detailed, consistent, and indicative of a strong long-term memory. Having listened to Mangrum's testimony and assessed his candor and demeanor, the Court finds him to be genuine and credible. This finding is further supported by the underlying state court record, which speaks to Mangrum's integrity and good character. *See, e.g.*, Pl.'s Ex. 1 at 104, 263. In these findings of fact, the Court weaves together the excerpts of testimony from the state court record admitted into evidence and Mangrum's testimony at trial to establish a chronology spanning approximately six decades.

Mangrum testified that he first met Wynder in approximately 1955, when he was dating Wynder's sister who later became his wife. Tr. of Nov. 16, 2018 Trial ("Trial Tr.") 10:16-23, ECF No. 45. From the outset of their relationship, Mangrum assisted Wynder with day-to-day activities such as laundry and yard maintenance. *Id.* 10:20-11:9; *see also id.* 31:22-25. Those who knew Mangrum and Wynder recognized the trusting familial relationship they had formed. *See* Pl's Ex. 1 at 104, 231.

After suffering health setbacks in her later years, Wynder sought assistance from Jacqueline Parham ("Parham") with the preparation of a general power of attorney that appointed Mangrum as Wynder's attorney-in-fact. *Id.* at 219-20. Parham is not a lawyer. *Id.* at 220. Nevertheless, she agreed to assist Wynder with the preparation of the general power of attorney and later with the preparation of a medical power of attorney and a will. *Id.* at 221-22.; *see also* Trial Tr. at 12:6-14. There is no indication that Parham provided advice of any kind to Wynder or Mangrum in connection with her preparation of the power of attorney document. *See* Trial Tr. at 12:6-14; Pl's Ex. 1 at 220-22. Instead, Parham explained that she simply met with Wynder to confirm her desire to execute a power of attorney and put together the document in accordance

4

with Wynder's directions. Pl's Ex. 1 at 220-22. Parham recalled that Mangrum expressed to her that his only objective in agreeing to serve as Wynder's attorney-in-fact was to execute whatever Wynder asked of him. *Id.* at 224. Wynder signed the general power of attorney on May 11, 2010 (the "POA"), appointing Mangrum as her attorney-in-fact and bestowing him with broad authority. *Id.* at 177-78. The POA does not make any reference to or suggest the existence of the provisions of Virginia law that govern the conduct of attorneys-in-fact. *See id.* at 174-78.

Mangrum understood his role as attorney-in-fact to include handling Wynder's financial affairs. *Id.* at 47. He recalled that, within weeks of his appointment as attorney-in-fact, he accompanied Wynder to the bank so that she could introduce him, as her attorney-in-fact, to her point of contact there and to visit her safe deposit box. Trial Tr. 12:21-14:17; Pl's Ex. 1 at 48-49. Mangrum testified that he and Wynder met often after he became her attorney-in-fact and that the two worked together to manage Wynder's financial affairs. Trial Tr. 29:20-22; *see also* Pl's Ex. 1 at 54-55, 201. Mangrum also repeatedly testified that all the actions he took on Wynder's behalf as her attorney-in-fact were based on specific directives from Wynder herself. *See, e.g.*, Trial Tr. 14:15-15:8, 18:2-9, 20:2-22:13, 29:9-32:12. There is no evidence in the record to dispute this.

In or about March 2012, after experiencing serious health problems that led to a stay in a rehabilitation facility, Wynder moved into Mangrum's home. Pl's Ex. 1 at 147-49; *see also id.* at 28-29. Because of the decline in her physical health, Wynder required a caregiver to assist her with the activities of daily living, and Mangrum's daughter assumed this role. *Id.* at 29, 118-22. Visitors to the home reported that Wynder was well taken care of. *Id.* at 104-05, 224. Although Wynder was no longer in good physical health, those who knew her remarked that she retained her mental capacity and ability to communicate. *See id.* at 117-18, 122, 224-25. Indeed, the record reflects that, even during her later years, Wynder remained a meticulous person who stayed on top

5

of her affairs and did not hesitate to express her wants and needs. *See id.* at 105-06, 123-24, 126, 129, 153-54. Both Mangrum and his daughter reported that Wynder continued to personally review her bank statements and other mail after moving into the Mangrum home. *Id.* at 58-59, 127-28. Given Wynder's personality and her continued involvement in her financial affairs, Mangrum was convinced that Wynder was aware of the status of her financial affairs up until the days just preceding her death. *Id.* at 54-56, 85-87; *see also id.* at 125.

At about the same time Wynder moved from the rehabilitation facility to Mangrum's home, Mangrum cashed in the Annuity. *See id.* at 179-80. Mangrum testified that he cashed in the Annuity pursuant to Wynder's explicit instruction. Trial Tr. 14:18-15:4, 29:9-11, 30:5-10. In connection with this instruction, Mangrum visited the bank. *Id.* 15:9-17. Mangrum testified that the bank initially refused to honor the POA, though he was unable to describe the exact problem he encountered with particularity. *See id.* 15:9-16:22. Mangrum explained that bank personnel informed him that he needed a document he referred to variously as a "stipulation in that writing," "new writeup," and "the paper." *Id.* 16:16-17:20; *see also id.* 36:14-37:4.

Mangrum returned to the bank and ultimately successfully cashed in the Annuity, depositing the proceeds first into an account held jointly with Wynder and later withdrawing the funds to deposit them into his personal bank account. *Id.* 18:4-9, 29:23-30:25; *see* Pl.'s Ex. 1 at 179-80. Mangrum maintains, and the record is unrebutted on the fact, that Wynder directed him to transfer the proceeds into his personal account. Trial Tr. 18:4-9, 29:23-30:25. He explained that the proceeds from the Annuity were to be allocated to Wynder's daily expenses, future funeral expenses, and costs associated with preparing Wynder's former residence for sale. *Id.* 20:11-21:23. Mangrum further explained that Wynder instructed him to retain the balance of the funds, if any, that remained after her death. *Id.* 20:13-18. Given that Wynder's physical health

6

necessitated she move into Mangrum's home for full-time care, the Court finds particularly credible Mangrum's explanation as to why he surrendered the Annuity, transferred the proceeds to his personal account, and believed he could retain any remaining balance following Wynder's death.

Despite all of this, Mangrum admitted that he did not believe it was necessary to keep an accounting of his spending or written records of Wynder's directives. *Id.* 20:5-13; Pl.'s Ex. 1 at 78. Nor did Mangum question what Wynder asked of him, and to that end stated, "I trusted [Wynder]. That's why everything that she would tell me to do, I did it." Trial Tr. 32:11-12.

Wynder passed away on June 5, 2013. Pl's Ex. 1 at 116. About a year later, Chavis and her siblings commenced an action in the Circuit Court, alleging that Mangrum violated the Virginia Uniform Power of Attorney Act and seeking entry of a judgment against him. *Id.* at 1-3. The Circuit Court entered judgment against Mangrum, requiring that he restore $171,615.39 to the Estate. *Id*. at 284-85. Of this amount, the Circuit Court attributed $116,330.64 to Mangrum's improper cashing in of the Annuity, $36,000.00 to an improper transfer from Wynder's bank account to an account owned by Doris Mangrum, and $19,284.75 to attorney's fees and costs. *Id*. at 262-63, 284-85. The Circuit Court also acknowledged that Mangrum failed to provide a full and complete accounting of his activities as attorney-in-fact but did not impose any consequences for this failure, recognizing that Mangrum was overwhelmed in his role, especially given his health and advanced years and that an accounting would yield little benefit. *Id.* at 262-63. On appeal, the Supreme Court of Virginia determined that the $36,000 transfer was not attributable to any conduct by Mangrum, and thus reversed this portion of the Circuit Court's judgment. Pl's Ex. 3 at 3-4, 7. The Supreme Court of Virginia also relieved Mangrum from the award of attorney's fees and costs, concluding that § 1615(2) of the Virginia Uniform Power of Attorney Act does not

7

authorize such an award. *Id.* at 6-7. Finally, the Supreme Court of Virginia affirmed the Circuit Court's award of $116,330.64 (the "Debt"), which arose from Mangrum's cashing in of the Annuity in violation of § 1612 of the Virginia Uniform Power of Attorney Act. *Id.* at 7. Chavis now seeks a determination that the Debt is nondischargeable under § 523(a)(4).

## Conclusions of Law

One of the primary benefits of the Bankruptcy Code is a debtor's opportunity to obtain a fresh start by discharging prepetition debts. *Dominion Va. Power v. Robinson* (*In re Robinson*), 340 B.R. 316, 328 (Bankr. E.D. Va. 2006) (citing *KMK Factoring, L.L.C. v. McKnew* (*In re McKnew*), 270 B.R. 593, 617 (Bankr. E.D. Va. 2001)). This opportunity is limited, however, by the exceptions to discharge enumerated in § 523(a). Courts construe these exceptions to discharge narrowly against the creditor and in favor of the debtor to preserve the Bankruptcy Code's "fresh start" policy. *Id.* at 329 (citing *Foley & Lardner v. Biondo* (*In re Biondo*), 180 F.3d 126, 130 (4th Cir. 1999)). Yet the narrow construction of exceptions to discharge must be balanced equally with a court's duty to "ensur[e] that perpetrators of fraud are not allowed to hide behind the skirts of the Bankruptcy Code." *Biondo*, 180 F.3d at 130 (citing *Cohen v. Cruz*, 523 U.S. 213 (1998)).

The exception to discharge at issue here is found in § 523(a)(4), which provides, in relevant part, that a discharge under § 727 does not discharge a debtor from a debt for "defalcation while acting in a fiduciary capacity." § 523(a)(4). To succeed on a claim for defalcation by a fiduciary, a plaintiff must prove that the debt arose (1) while the debtor acted in a fiduciary capacity and (2) from the debtor's defalcation. *Kubota Tractor Corp. v. Strack* (*In re Strack*), 524 F.3d 493, 497 (4th Cir. 2008) (citing *Pahlavi v. Ansari* (*In re Ansari*), 113 F.3d 17, 20 (4th Cir. 1997)); *see also Larsen v. Larsen* (*In re Larsen*), No. 1-16-01116-NHL, 2018 WL 4006935, at *6 (Bankr. E.D.N.Y. Aug. 17, 2018) ("[Section] 523(a)(4) requires that the debt be 'for,' or arise out of, defalcation

8

such that there is a causal relationship between the act constituting defalcation and the debt in question."). The plaintiff bears the burden of proving each element by a preponderance of the evidence. *Strack*, 524 F.3d at 497 (citing *Grogan v. Garner*, 498 U.S. 279, 291 (1991)).

### Fiduciary Capacity

As an attorney-in-fact under a general power of attorney, Mangrum's conduct was governed by the Virginia Uniform Power of Attorney Act. The Debt at issue arose from the judgment entered by the Circuit Court, as affirmed in part by the Supreme Court of Virginia, that Mangrum violated § 1612 of the Virginia Uniform Power of Attorney Act when he cashed in the Annuity pursuant to the authority granted to him under the POA.

Although Mangrum generally denied his role as a fiduciary in his Answer to the Complaint, he has not raised any arguments in this case to dispute that he stood in a fiduciary relationship with respect to Wynder as her attorney-in-fact. *See* Answer at 1; *see generally* Trial Tr.; Def's Post-Trial Br., ECF No. 47. In fact, the parties advised the Court that the only issue in this case was whether Mangrum committed defalcation under § 523(a)(4). Thus, determining Mangrum's fiduciary capacity to be uncontested, the Court confined the scope of the proceedings to the question of whether Mangum's cashing in of the Annuity amounted to defalcation under § 523(a)(4).

### Defalcation

The principal issue in this case is whether Mangrum committed defalcation within the meaning of § 523(a)(4). This issue turns on whether Mangrum cashed in the Annuity with the requisite culpable state of mind. In *Bullock v. BankChampaign, N.A.*, 569 U.S. 267 (2013), the Supreme Court of the United States resolved lingering uncertainties regarding the mental state required to commit an act of defalcation under § 523(a)(4). *See id.* at 272-73.

9

Prior to *Bullock*, the burden on a plaintiff seeking to exclude a debt from discharge under § 523(a)(4) in the Fourth Circuit was relatively low and determined largely by reference to non-bankruptcy law that imposed a near strict liability standard. *See e.g.*, *Strack*, 524 F.3d at 497-98 n.7 (quoting *Rwanda v. Uwimana* (*In re Uwimana*), 274 F.3d 806, 811 (4th Cir. 2001)) ("[N]egligence or even an innocent mistake . . . is sufficient [to establish defalcation]."). A debtor's mental state was rarely at issue in pre-*Bullock* cases. However, consistent with the mandate that exceptions to discharge must be construed narrowly, *Bullock* imposed a heightened culpable state of mind requirement for § 523(a)(4) that eased accountability for nonprofessional fiduciaries who seek bankruptcy protection. *See Bullock*, 569 U.S at 276.

In *Bullock*, the Supreme Court concluded that, in the absence of "bad faith, moral turpitude, or other immoral conduct," defalcation requires a showing of an intentional wrong. *Id.* at 273. An intentional wrong includes "not only conduct that the fiduciary knows is improper but also reckless conduct." *Id.* at 273-74. Accordingly, nondischargeable debts arising from defalcation include: (1) debts resulting from acts of bad faith, moral turpitude or other immoral conduct; (2) debts resulting from conduct that a fiduciary knows is improper; and (3) debts resulting from reckless conduct, which a fiduciary does not have actual knowledge is improper. *Heers v. Parsons* (*In re Heers*), 529 B.R. 734, 741-43 (B.A.P. 9th Cir. 2015). Each of the foregoing necessitates an inquiry into a debtor's subjective knowledge and state of mind. As observed by Judge Preston in *DeWine v. Dudley* (*In re Dudley*), 582 B.R. 708 (Bankr. S.D. Ohio 2017), courts must employ a facts and circumstances analysis to determine whether a debtor possessed the requisite state of mind to commit defalcation:

> [T]he culpable state of mind requirement will rarely be admitted; it must be inferred from the circumstances of the case. *See Sacklow v. Vecchione* (*In re Vecchione*), 407 F. Supp. 609, 615 (E.D.N.Y. 1976) ("Persons whose intention it is to shield their assets . . . rarely announce their purpose. Instead, if their intention is to be

10

> known, it must be gleaned from inferences drawn from a course of conduct."); *Cupit*, 514 B.R. at 51 ("Conscious disregard, like other intent elements, may be inferred from the particular facts of the case."); *People v. Hall*, 999 P.2d 207, 220 (Colo. 2000) ("A court or trier of fact may infer a person's subjective awareness of a risk from the particular facts of a case, including the person's particular knowledge or expertise.").

*Id.* at 727-28.

Applying this framework, the Debt in this case does not arise from conduct involving bad faith, moral turpitude, or other immoral conduct. In its letter opinion, the Circuit Court expressly acknowledged Mangrum's good character. Pl's Ex. 1 at 263. This Court agrees with the Circuit Court's observation. In fact, the record in this proceeding is bereft of any evidence to suggest that Mangrum acted immorally or in bad faith by cashing in the Annuity. And, importantly, Chavis has not asserted this to be the case.

The Court's focus then shifts to whether Mangrum surrendered the Annuity with actual knowledge that doing so violated the Virginia Uniform Power of Attorney Act. There is likewise no evidence in the record to support an inference that Mangrum cashed in the Annuity with actual knowledge that, by doing so, his conduct would violate § 1612 of the Virginia Uniform Power of Attorney Act.

Thus, in the absence of bad faith or actual knowledge, the crux of this case becomes whether Mangrum's breach of his fiduciary duties was the product of reckless conduct. Section 523(a)(4) excepts debts from discharge for defalcation arising from reckless conduct if a plaintiff establishes that a debtor either consciously disregarded or was willfully blind to a substantial and unjustifiable risk that his conduct would violate a fiduciary duty. *Bullock*, 569 U.S at 274 (quoting Model Penal Code § 2.02(2)(c), p. 226 (Am. Law. Inst. 1985)). Mere evidence that a debtor *should have* been aware of the risk that his conduct would turn out to violate a fiduciary duty only demonstrates negligence and is thus insufficient to establish that he acted recklessly. *Cincinnati*

11

*Ins. Co. v. Chidester* (*In re Chidester*), 524 B.R. 656, 660 (Bankr. W.D. Va. 2015) (citing *MacArthur Co. v. Cupit* (*In re Cupit*), 514 B.R. 42, 50 (Bankr. D. Colo. 2014), *aff'd*, 541 B.R. 739 (D. Colo. 2015)).

Chavis advocates that reckless conduct under the *Bullock* standard "is demonstrated by proof of behavior on the part of the debtor that represents a 'gross deviation' from the behavior of a law-abiding citizen." Pl's Post-Trial Br. at 9. This interpretation is misplaced. At this stage of the analysis, *Bullock* requires courts to evaluate a debtor's conduct based upon his *subjective* knowledge and point of view, and not based upon how his conduct compares to that of a hypothetical "law-abiding person." *See Cupit*, 514 B.R. at 53.

A finding of either conscious disregard or willful blindness first requires a determination that the debtor possessed a subjective awareness of the existence of his fiduciary duty. *Caitlin Energy, Inc. v. Rachel* (*In re Rachel*), 527 B.R. 529, 543 (Bankr. N.D. Ga. 2015). Then, to establish conscious disregard, the court must further find that the debtor was subjectively aware that his conduct *might* result in a breach of that fiduciary duty. *Id.* Willful blindness poses an even higher subjective awareness hurdle than conscious disregard. A willfully blind debtor is subjectively aware that his conduct poses a *probable* risk of breaching his fiduciary duty but intentionally declines to confirm the accuracy of his suspicion. *Cupit*, 514 B.R. at 52; *see also Glob.-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2063 (2011) ("(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact"). The Court of Appeals for the Seventh Circuit aptly likened a willfully blind debtor to someone who is playing ostrich to preserve a "patina of innocence." *Stoughton Lumber Co. v. Sveum*, 787 F.3d 1174, 1177 (7th Cir. 2015).

If a court does find that a debtor consciously disregarded or was willfully blind to a risk of violating his fiduciary duty, then "the inquiry turns to the nature of the risk itself." *Larsen v. Larsen* (*In re Larsen*), No. 1-16-01116-NHL, 2018 WL 4006935, at *7 (Bankr. E.D.N.Y. Aug. 17, 2018). *Bullock* requires that the risk be both substantial and unjustifiable. *Bullock*, 569 U.S. at 274. It is here where a court must apply the objective "law-abiding person" standard advocated by Chavis. To determine whether the risk is both substantial and unjustifiable, courts consider the magnitude of the risk and evaluate whether the debtor's conduct grossly deviated from what a law-abiding person would have done under similar circumstances. *Larsen*, 2018 WL 4006935, at *7 (citing *Bullock*, 569 U.S. at 274; *Cupit*, 514 B.R. at 52). Accordingly, this final consideration offers a safe harbor to a debtor who consciously disregarded or was willfully blind to the risk that his conduct would turn out to violate his fiduciary duties if the ordinary "law-abiding person" would have also engaged in the same conduct given the circumstances and magnitude of the risk.

*Mangrum's State of Mind*

To determine whether Mangrum's breach of his fiduciary duties was the product of reckless conduct, the Court must examine whether Mangrum was aware of the existence of the Virginia Uniform Power of Attorney Act or even more generally that laws exist to govern the conduct of an attorney-in-fact. If the evidence demonstrates that Mangrum was aware of his fiduciary duties to Wynder, the Court must then determine whether he consciously disregarded or was willfully blind to the risk of violating that duty when he cashed in the Annuity. Only upon a finding of conscious disregard or willful blindness would the Court proceed to determine whether the risk that surrendering the Annuity would violate Mangrum's fiduciary duties was substantial and unjustifiable.

The Court begins with the threshold inquiry: whether Mangrum was subjectively aware of his fiduciary duties. Chavis asserts that Mangrum's testimony at trial before this Court

> does not suggest any state-of-mind incapacity on the part of Mr. Mangrum. To the contrary, it reveals a gentleman who knew full well what he was doing in his role as attorney-in-fact for [Wynder]. He simply did not then (and does not now) think it was wrong . . . But his own assessment of what was right and what was wrong is of no consequence in light of the State Court Rulings - - which are not subject to reversal by this Court.

Pl.'s Post-Trial Br. at 12. The Court agrees with Chavis in part. The Court finds that when cashing in the Annuity, Mangrum "knew full well what he was doing" to the extent he understood that cashing in the Annuity would result in proceeds. The Court further agrees that Mangrum did not believe surrendering the Annuity was wrong. The central theme of Mangrum's testimony was that he simply followed Wynder's instructions, and that forms the basis for his sincerely held belief that he acted properly as her attorney-in-fact. To frame his belief rhetorically: how could he have committed any wrongdoing if his actions on Wynder's behalf were based on instructions from Wynder herself?

The Court disagrees with Chavis, however, that Mangrum's "own assessment of what was right and what was wrong" is of no consequence. Although Mangrum's perception of right and wrong was inconsequential in determining liability under state law, Chavis' argument ignores that Mangrum's state of mind is critical to the matter before this Court because *Bullock* demands the Court assess his subjective beliefs, understanding, and knowledge.

A debtor's subjective awareness of his fiduciary duties may be inferred from his knowledge and sophistication. *Compare Baggett v. Sherman* (*In re Sherman*), No. 15-50026, 2016 WL 8458774, at *5 (Bankr. N.D.N.Y. Mar. 7, 2016) (holding that a debtor who had no experience as a general contractor prior to the construction of plaintiff's house lacked the knowledge and experience that would have informed him of his duties to maintain the plaintiff's funds in a trust

14

account); *and Milwaukee Builders Supply, Inc. v. St. Antoine* (*In re St. Antoine*), 533 B.R. 743, 750 (Bankr. E.D. Wis. 2015) (holding that, despite having some awareness of the relevant "theft by contractor" statute, debtors were not actually aware of or willfully blind to their obligations when they had neither read the statute nor been educated about their fiduciary duties); *with Cupit*, 514 B.R. at 53 (finding that a separate lawsuit against the debtor under the same statute "gave [the debtor] an awareness that there was a high probability he owed fiduciary duties . . . under the statute"); *Chidester*, 524 B.R. at 665-66 (holding that a debtor, who was an attorney, could understand the fiduciary duties attendant to being a conservator and had previously acknowledged his understanding of such duties).

The simple fact that Wynder executed the POA, designating Mangrum as her attorney-in-fact, does not permit the Court to impute to Mangrum any knowledge or understanding of the fiduciary status imposed upon him under Virginia law or the duties attendant to such status. Moreover, the POA itself does not contain any mention of, or implied reference to, the provisions of Virginia law that establish the duties imposed upon an attorney-in-fact. The POA was drafted by a nonlawyer who, even assuming she understood the legal ramifications of the document she prepared, properly refrained from providing any legal advice concerning the POA to Wynder or Mangrum. Accordingly, there is no indication that the fiduciary duties imposed upon attorneys-in-fact were addressed in the course of the preparation of the POA or in the POA itself to put Mangrum on notice of his fiduciary duties.

Also, while Mangrum is undoubtedly a valued and respected member of his family and community, the Court finds that Mangrum is a layperson with respect to legal and financial matters who did not possess the acumen necessary to appreciate his duties as attorney-in-fact. Mangrum's lack of sophistication was revealed in his testimony regarding the bank's initial failure to honor

15

the POA, which demonstrated only a vague understanding of the issue presented or the nature of the additional documentation the bank requested. There is nothing in the record to suggest that Mangrum had any prior experience as an attorney-in-fact or in any other fiduciary capacity. Further, there is also nothing in the record to suggest that Mangrum had any prior professional experience, legal training, or other education that would have familiarized him with the responsibilities of a fiduciary. Although the POA granted Mangrum broad powers to control Wynder's financial affairs, the Court does not believe that is how Mangrum understood his role. Mangrum's testimony instead suggests his understanding of his role was more limited: to perform Wynder's intentions when her diminished physical health made it difficult or impossible for her to do so herself. This limited perception of his role as attorney-in-fact contributed to Mangrum's failure to appreciate his fiduciary status. For these reasons, the Court finds that Mangrum lacked the knowledge or experience to inform him of his fiduciary duties or even to equip him with the instinct needed to investigate the potential legal consequences of assuming the role of attorney-in-fact.

Finally, a debtor's conduct following a violation of his fiduciary duties also provides insight into his state of mind. *Aiello v. Aiello* (*In re Aiello*), 660 F. App'x 179, 184 (3d Cir. 2016) (concluding that evidence of the debtor's efforts to conceal his self-dealing constituted evidence of his culpable state of mind); *Sveum,* 787 F.3d at 1177 (determining that a contractor-debtor understood that failing to pay subcontractors may risk violating his fiduciary duties because he later lied about having paid them in sworn statements). Mangrum's conduct after he surrendered the Annuity shows none of the hallmarks of someone who was aware of his fiduciary obligations and thus understood the risk that his conduct might violate a fiduciary duty. Far from it. Mangrum did not attempt to conceal that he cashed in the Annuity or wall Wynder off from her financial

16

affairs to avoid revealing his conduct. Instead, he met regularly with Wynder—who all agree remained sharp and interested in her affairs despite the decline in her physical health—concerning her finances.

To be sure, another person in Mangrum's position might have known of the fiduciary obligations attendant to the role of attorney-in-fact, but what any other person may have known or what Mangrum *should have* known about his fiduciary status is of no moment. Mangrum's demeanor and the whole of his testimony convince the Court that he is a well-meaning layperson who was subjectively unaware of the fiduciary duties associated with his role as attorney-in-fact. The logical consequence is that Mangrum could not consciously disregard or be willfully blind to a risk that his conduct might violate a fiduciary duty of which he was unaware. Having concluded that Mangrum neither consciously disregarded nor was willfully blind to a risk that his conduct would turn out to violate a fiduciary duty, the Court need not assess the nature of the risk.

### Conclusion

This is not a case where a bad actor is attempting to use bankruptcy as a shield for improper conduct. While there is no doubt Mangrum violated Va. Code § 64.2-1612 by cashing in the Annuity or that Mangrum is liable for his state law violation absent bankruptcy protection, the state law violation alone does not establish nondischargeable defalcation under § 523(a)(4). *Bullock* imposes a culpable state of mind requirement that Virginia law does not. At its core, this case demonstrates the difference between the Virginia law determination of liability and the narrower scope of nondischargeable liability under bankruptcy law.

Chavis has failed to establish by a preponderance of the evidence that Mangrum committed defalcation as defined by § 523(a)(4) and interpreted by the Supreme Court in *Bullock*. The Court

Case 17-05007-FJS   Doc 50   Filed 05/14/19   Entered 05/14/19 15:30:23   Desc Main
Document      Page 18 of 18

believes that Mangrum is the exact type of nonprofessional fiduciary the Supreme Court had in mind when it imposed the heightened mental state standard in *Bullock*.

Accordingly, for the reasons stated in this Memorandum Opinion, the Court finds and concludes that the Debt is dischargeable. The parties shall bear their own attorney's fees and costs. The Court will enter a separate Order consistent with the findings and conclusions contained in this Memorandum Opinion.

The Clerk shall deliver copies of this Memorandum Opinion to Peter G. Zemanian, counsel for the Plaintiff; and Sherman C. Smith, counsel for the Defendant.

Entered this 14th day of May 2019, at Newport News in the Eastern District of Virginia.

5-14-2019

FRANK J. SANTORO
United States Bankruptcy Judge

Entered on Docket: May 14 2019